1  **WO**
2
3
4
5
6             **IN THE UNITED STATES DISTRICT COURT**
7              **FOR THE DISTRICT OF ARIZONA**
8
9  Mary Chesier,                                  No. CV-17-04034-PHX-DWL
10                 Plaintiff,                     **ORDER**
11       v.
12  On Q Financial Incorporated,
13                 Defendant.
14
15                                **INTRODUCTION**
16       Mary Chesier[1] worked for On Q Financial Incorporated ("On Q") in an administrative capacity. One of her supervisors was Thomas Middleton, who served as On Q's Vice President of Business Development. On March 20, 2017, Chesier and Middleton were engaged in a work-related discussion over an instant messaging app when the discussion veered off in a sexual direction. This detour was unexpected—they had not engaged in any prior discussions of a sexual nature. Over the course of three hours (with some breaks), both sent sexually explicit messages to each other, with Middleton asking questions about Chesier's underwear, both parties discussing Middleton's "dominance" in the bedroom, Chesier providing her measurements, and Middleton stating he wanted to engage in sexual conduct with Chesier.

       Although the text messages, when read in isolation, give the impression that Chesier

---
[1] The parties refer to Plaintiff as Cheshier in much of their summary judgment briefing, but the Court will refer to her as Chesier—the name used in her complaint and in the caption of this case—in this order.

was enjoying the exchange, Chesier contends she was actually shaking and crying during the episode and participated only because she wanted to appease her boss. The very next morning, Chesier sent a distraught email to a coworker seeking assistance. The email culminated in a meeting later that day between Chesier and a member of On Q's Human Resources department. On Q promptly fired Middleton.

In this lawsuit, Chesier asserts a claim against On Q under Title VII of the Civil Rights Act of 1964, alleging she was subjected to a hostile working environment. Now pending before the Court is On Q's motion for summary judgment, which argues that Chesier hasn't satisfied two elements of her *prima facie* case and that it has separately established a "reasonable care" affirmative defense. (Doc. 61.) Chesier disagrees and has filed her own motion for partial summary judgment, arguing that the "reasonable care" affirmative defense is inapplicable in cases (such as this one) involving "sudden sexual harassment." (Doc. 59.)

For the following reasons, the Court grants On Q's motion and denies Chesier's motion as moot. Although the Court disagrees with On Q's contention that Middleton's conduct was not "unwelcome" as a matter of law—a rational jury could easily find that Chesier was mortified and that the power differential between her and Middleton explains why she adopted a playful tone during the exchange—the Court agrees with On Q that the conduct was not "sufficiently severe or pervasive" to trigger liability under Title VII. This case involves in single instance in which a supervisor sent improper messages to a subordinate. There was no physical contact. Although it is possible for a single incident of harassment to create liability, the Ninth Circuit has emphasized that the single incident must involve an "extremely severe" form of harassment and has identified rapes and other violent physical assaults as the only types of conduct that might qualify. The conduct at issue here—a single string of sexually-charged messages, divorced from any physical contact—is simply not enough.

…

…

**BACKGROUND**

The following facts are undisputed:

Chesier was hired by On Q on October 3, 2016. She received On Q's employee handbook on November 2, 2016 and had electronic access to the handbook during her period of employment. This handbook included On Q's anti-harassment policy, which provided that employees who feel they have been subjected to harassment should immediately report their concerns to their supervisor, Human Resources, or a member of senior management.

Chesier and Middleton engaged in a conversation over a work instant message system on March 20, 2017. This conversation occurred over the course of three hours with some breaks. Both parties sent sexually explicit messages. Examples of these messages include: Middleton asking Chesier about her underwear and her describing them; Middleton asking to see Chesier's underwear and Chesier responding maybe at a later date; both parties discussing Middleton's "dominance" in the bedroom; Chesier providing her measurements, including height, weight, and bra size, to Middleton; Middleton stating he wanted to see Chesier's breasts and suck on them; and Middleton stating multiple times he wanted to make Chesier "wet." Chesier declined Middleton's requests to see her underwear, "send [him] pics," "see [her breasts] and suck on them and bite them," and "let him feel."

That same day, Middleton sent Chesier a single text message saying he wanted to "feel [her] and suck on [her] tits," "feel [her] and then taste [his] fingers," and "make [her] put [her] wet fingers in [his] mouth." She did not respond to the content of that message, stating instead: "Totally random thought/question. You pay for your daughters cell right? As the person who's name it's all done under etc. are you able to get into her texts and read them or anything? Like from the carriers web sight?"

During the instant message exchange, Chesier described the conversation as having "a decent ebb and flow" and "some tit for tat." She also told Middleton he could "ask all [he] want[ed]." Several times she expressed gratitude for his compliments and when

Middleton stated, "thanks for playing along a little," she replied, "[y]ou're welcome lol." She closed the exchange by noting she was "happy to help" and that the day had been "not too shabby for a [M]onday."

Chesier testified in her deposition that Middleton's comments were unwelcome and that she was not a "willing participant" in the conversation. When asked about the "decent ebb and flow" statement, she claimed: "I think it more just says the conversation seems to be going back and forth, but it speaks nothing to the willingness of either participant." She also contended: "He had asked if this was one-sided, and I was grasping for an answer that would again keep him appeased, but I didn't want to actually say, 'Yes, this is fine by me, because it truly wasn't.'" And when asked if the conversation was "fine" with her, she stated: "I think it reflects somebody who is kind of deflecting and not wanting to answer that question." Additionally, when asked about her message, "You can ask all you want," she testified that she was "[t]rying to keep him appeased and happy, just get through the day. I was trying to not give him any indication that I could be trouble for him." Finally, she stated that she did not respond to the content of Middleton's text message because she was "hoping to delay and deter him and distract him once again, rather than responding to the extremely vulgar text message."

Chesier also testified in her deposition that as this conversation was happening, she was upset and crying at her desk. She further testified that she responded to Middleton "out of fear" and that she "was legitimately afraid of him if he were to get the vibe that [she] . . . could potentially threaten his job or cause problems for him there." She stated: "[A]t that time I was legitimately sitting at my desk in tears, and I was shaking and I was just worried about trying to get through this day safely so I could get home and break down and figure out what to do."

Chesier admits there was never any unwelcome or unwanted physical touching between her and Middleton. She testified during her deposition that she and Middleton had established that anything physical was "absolutely off the table."

Chesier first complained of the incident the next morning when she sent an email,

- 4 -

from her phone, to a co-worker named Erin Dueck ("Dueck"). This was the first time she complained to anyone of harassment at On Q.

Dueck met with Chesier a few hours later. Kevin Grindle ("Grindle"), On Q's Vice President of Human Resources at the time, also joined the conversation. When Chesier showed Grindle the transcript of the messages, he noted there was "some very concerning material in there."

After speaking with Dueck and Grindle, Chesier was allowed to go home, with pay, while On Q initiated an internal investigation. This investigation concluded on March 23, 2017, at which time On Q fired Middleton.

Chesier voluntarily resigned on March 24, 2017—the day after Middleton was fired. She testified that she wanted to resign because she believed that other team members continued to owe loyalties toward Middleton and because she believed Middleton and another On Q employee may have had an intimate relationship. She had not been fired or reassigned or refused a promotion.

## LEGAL STANDARD

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Rookaird v. BNSF*

*Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "A genuine dispute of material fact exists if 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *United States v. JP Morgan Chase Bank Account No. Ending 8215 in Name of Ladislao V. Samaniego, VL: $446,377.36*, 835 F.3d 1159, 1162 (9th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird*, 908 F.3d at 459. Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**ANALYSIS**

A. <u>Title VII</u>

"Title VII of the Civil Rights Act of 1964 makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 63 (1986) (quoting 42 U.S.C. § 2000e-2(a)(1)). A Title VII claim for discrimination based on sex is recognized for "the creation of a hostile work environment that 'is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1161 (9th Cir. 2017) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "An employer is vicariously liable for a hostile work environment created by a supervisor." *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 689 (9th Cir. 2017).

"A hostile work environment occurs when an employee 1) was subjected to verbal or physical conduct of a sexual nature, 2) this conduct was unwelcome, and 3) this conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Fuller*, 865 F.3d at 1161 (internal quotation

marks and citations omitted).

Where the alleged harasser is a supervisor, even if a plaintiff satisfies the three-part *prima facie* test, the defendant employer may nonetheless avoid liability under a "reasonable care" defense. *Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1055 (9th Cir. 2007). To sustain this affirmative defense, the defendant employer must "show[] by the preponderance of the evidence '(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)).

On Q does not dispute Middleton's status as Chesier's supervisor and has conceded the first element of the *prima facie* test. On Q contests only the second and third elements of the *prima facie* test and asserts the "reasonable care" defense. (Doc. 61.)

B.   Unwelcome

To determine whether conduct was unwelcome, courts consider whether the plaintiff "by her conduct indicated that the alleged sexual advances were unwelcome." *Meritor Sav. Bank*, 477 U.S. at 68; *see also Nichols v. Azteca Rest. Enterprises, Inc.*, 256 F.3d 864, 873 (9th Cir. 2001) ("We must determine whether Sanchez, by his conduct, indicated that the alleged harassment was 'unwelcome.'").

On Q argues that Chesier's "conduct—specifically her own sexually explicit messages sent to Mr. Middleton—indicate she was a willing participant in the inappropriate conversation and the conduct was not unwelcome." (Doc. 61 at 7.) On Q then cites some out-of-circuit cases for the proposition that the alleged harasser's conduct cannot be unwelcome where the plaintiff appears to have actively participated in that conduct. (*Id.* at 8.)

On Q, however, ignores one of the Supreme Court cases it cites—*Meritor Savings Bank*—which held that the relevant question for the court is not whether the plaintiff's "actual participation" in the conduct was "voluntary." 477 U.S. at 68. Instead, the correct

question is whether the plaintiff "by her conduct indicated that the alleged sexual advances were unwelcome." *Id.* A plaintiff may appear to participate in sexual conduct without necessarily welcoming that conduct. *Cruz v. Centene Corp.*, 2016 WL 3906293, *2 (S.D. Tex. 2016) ("[H]arassment may be subtle, and what is—on its face—consensual or voluntary may truly be coerced under all of the circumstances. Cruz's admission that she played along with [her supervisor's] requests is not determinative.").

On Q relies on *Weinsheimer v. Rockwell Int'l Corp.*, 754 F. Supp. 1559 (M.D. Fla. 1990), *aff'd*, 949 F.2d 1162 (11th Cir. 1991), in support of its argument that Chesier's "active engagement, and at times outright encouragement, demonstrates the conduct between the two parties was not unwelcome." (Doc. 61 at 8.) This argument is unavailing. In *Weinsheimer*, the court found the plaintiff's conduct did not indicate her coworkers' sexual conduct was unwelcome because she had "told sexual stories or made sexual gestures at work," thus "active[ly] contribut[ing] to the sexually explicit environment" of the workplace. *Id.* at 1564. The court further found that the plaintiff had not previously reported the alleged harassment to her supervisors. *Id.* As noted in another case cited by On Q, *Perkins v. Gen. Motors Corp.*, 709 F. Supp. 1487, 1499 (W.D. Mo. 1989), one factor for a court to consider in assessing unwelcomeness is "[w]hether and, if so, when, plaintiff reported or complained about any of the incidents at issue." *Compare Nichols*, 256 F.3d at 873 ("That Sanchez complained about the frequent, degrading verbal abuse supports our conclusion that the conduct was unwelcome, as does Sanchez's unrebutted testimony to that effect."), *with Loftin-Boggs v. City of Meridian, Miss.*, 633 F. Supp. 1323, 1326-27 (S.D. Miss. 1986), *aff'd sub nom. Loftin-Boggs v. Meridian*, 824 F.2d 971 (5th Cir. 1987) (finding that plaintiff failed to establish conduct was unwelcome where she "failed to relate to any of her supervisors or co-workers that she found the alleged sexual harassment to be embarrassing, humiliating or generally unwelcomed").

Here, a jury could find that Chesier engaged in conduct indicating Middleton's advances were unwelcome. She declined his requests for physical contact and pictures, didn't respond to the content of his text message, reported the conversation the very next

morning, and cried and shook during the entirety of the conversation. *Cf. E.E.O.C. v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 998 (9th Cir. 2010) (finding that plaintiff "unquestionably established a genuine issue of fact regarding whether the conduct was welcome" because, among other reasons, he "swore under oath that it was not," and "[i]t made him cry, both at the time and repeatedly in the deposition"). Also, unlike in *Weinsheimer*, there is no evidence Chesier previously engaged in any sexual conduct or conversation in the workplace, thereby encouraging a sexually explicit environment.

On Q's reliance on *Holmes v. N. Texas Health Care Laundry Coop. Ass'n*, 304 F. Supp. 3d 525 (N.D. Tex. 2018), is similarly misplaced. There, the court rejected the plaintiff's argument that her "e-mail comments to [the alleged harasser] were 'an attempt to appease him, to placate him, to tell him what he wanted to hear'" in part because the plaintiff had participated in sexual messaging and physical acts with the alleged harasser for a months-long period and never reported any harassment to her employer. *Id.* at 538, 544. Those circumstances aren't present here.[2]

The Supreme Court has noted that "the question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact." *Meritor Sav. Bank*, 477 U.S. at 68. Given the conflicting evidence, this Court cannot conclude, as a matter of law, that Middleton's conduct was not unwelcome.

C. "Sufficiently Severe Or Pervasive"

"[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Meritor Sav.*

---

[2] *Dye v. BNSF Ry. Co.*, 2016 WL 492755 (D. Mont. 2016), and *Zhao v. Kaleida Health*, 2008 WL 346205 (W.D.N.Y. 2008), cited by On Q in its reply (Doc. 69 at 4), are distinguishable for similar reasons. In *Dye*, where the court found the plaintiff "welcomed and actively pursued" the alleged harasser, the plaintiff conceded the sexual interactions were consensual, acknowledged she was interested in the alleged harasser when they first engaged in sexual activities, admitted she was using the alleged harasser as much as he was using her, acknowledged she was trying to keep the alleged harasser interested in her, and admitted she had sex with the alleged harasser even after she was terminated by the employer. In *Shan Zhao*, the plaintiff engaged in a years-long sexual relationship with a co-worker and never complained about it until the co-worker reported it.

*Bank*, 477 U.S. at 67. "For sexual harassment to be actionable, it must be *sufficiently severe or pervasive* 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Id.* (citation omitted) (emphasis added).

"A working environment is abusive if 'hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position.'" *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1095 (9th Cir. 2008) (citation omitted). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances," which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. 17 at 23. Additionally, "a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Arizona ex rel. Horne v. Geo Grp., Inc.*, 816 F.3d 1189, 1206 (9th Cir. 2016) (citation omitted). "The required level of severity or seriousness 'varies inversely with the pervasiveness or frequency of the conduct.'" *Nichols*, 256 F.3d at 872 (9th Cir. 2001) (citation omitted). "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (citation omitted).

Chesier argues, as a threshold matter, that this case involves multiple incidents of harassment because "there are eleven different sexual statements occurring at different times." (Doc. 64 at 11.) But she cannot dispute that ten of the "eleven different sexual statements" appear in a single electronic conversation that occurred during a single three-hour period. The single explicit text message was also sent that same day. Thus, Chesier cannot establish that any harassment was "pervasive." *Cf. Brooks v. City of San Mateo*, 229 F.3d 917, 924 (9th Cir. 2000) (rejecting plaintiff's argument that "each of [her co-worker's] improper touchings constituted a separate incident"); *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 967 (9th Cir. 2002) ("[W]e assume *arguendo* that three

rapes in the course of one night constitutes a 'single' incident [for Title VII purposes].").

Because this case involves only a single incident of harassment, Chesier must demonstrate it was "extremely severe." The "extremely severe" requirement was addressed in *Brooks*, a case that "consider[ed] the legal implications of a single, rather unsavory, episode of workplace sexual harassment." 229 F.3d at 921. The plaintiff in *Brooks* was a telephone dispatcher. *Id.* One evening, a co-worker approached the plaintiff in an empty room, "placed his hand on her stomach and commented on its softness and sexiness." *Id.* When the plaintiff tried to push him away, the coworker then cornered her and "forced his hand underneath and sweater and bra to fondle her bare breast." *Id.* When the plaintiff again tried to stop the harassment, the co-worker propositioned her and "approached [her] as if he would fondle her breasts again." *Id.* The plaintiff then escaped and immediately reported the incident to management, which took steps to fire the co-worker following an investigation. *Id.* at 921-22.

Although the Ninth Circuit deemed the co-worker's conduct "highly reprehensible" and found he had "clearly harassed Brooks as she tried to do her job," it affirmed the district court's grant of summary judgment in the employer's favor because the harassment didn't satisfy the "sufficiently severe or pervasive" requirement. *Id.* at 927. In reaching this conclusion, the court declined to resolve "whether a single instance of sexual harassment can ever be sufficient to establish a hostile work environment" but noted that, "[i]f a single incident can ever suffice . . . the incident must be *extremely severe*." *Id.* at 925-26 (emphasis added). The court concluded the harassment endured by Brooks didn't meet this standard because she "did not allege that she sought or required hospitalization; indeed, she did not suffer any physical injuries at all." *Id.* at 926. Finally, the court identified two examples of the sort of single-incident conduct that might qualify as "extremely severe." First, the court cited, with approval, an out-of-circuit case[3] in which "a single incident was held to be sufficient" because the plaintiff had been slapped, beaten, hit in the head with a radio, choked with a phone cord, raped, and held captive overnight. *Id.* at 926. Second,

---

[3] *Al-Dabbagh v. Greenpeace, Inc.*, 873 F. Supp. 1105 (N.D. Ill. 1994).

- 11 -

the court stated, in a footnote, that "a sexual assault by a supervisor, even on a single occasion, may well be sufficiently severe." *Id.* at 927 n.9.

Two years later, in *Windermere*, the Ninth Circuit again considered whether a single incident of harassment was enough to create liability under Title VII. The plaintiff in *Windermere* was drugged by a client during a work-related dinner, kidnapped, and then raped three times over the course of the evening. 301 F.3d at 964. The Ninth Circuit concluded the harassment endured by the plaintiff met the "extremely severe" standard because "[r]ape is unquestionably among the most severe forms of sexual harassment" and emphasized that the challenged conduct stood "in contrast to the circumstances of *Brooks*," which involved only a "single instance of fondling." *Id.* at 967. The court also cited, with approval, two cases from other circuits in which a single incident involving a physical/sexual assault was deemed sufficiently severe to trigger liability. *Id.*[4]

The Court finds it notable that, although *Brooks* and *Windermere* identified five different sets of facts under which a plaintiff might be able to prevail on a hostile working environment claim premised on a single incident of harassment, all five of those examples involved the plaintiff being violently raped or enduring some similar form of physical assault. Indeed, even the facts at issue in *Brooks*, which were deemed insufficient as a matter of law, involved unwelcome physical touching (which resulted in the co-worker being prosecuted and sent to jail). This case, in contrast, does not involve any physical conduct or even a threat of the same—Chesier and Middleton had agreed in the conversation there would be no physical touching and Chesier does not argue she felt physically threatened.

In this respect, this case is similar to *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526 (7th Cir. 1993), which the Ninth Circuit cited approvingly in *Brooks*.[5] Saxton was an engineer

---

[4] The *Windermere* court characterized the first case, *Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1995), as holding that "even a single incident of sexual assault" may suffice, and characterized the second case, *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 464 (7th Cir. 1990), as "holding that a single incident where supervisor picked up plaintiff and forced her face against his crotch" may suffice.

[5] *Brooks*, 229 F.3d at 927.

who worked for AT&T. On one occasion in April 1988, her supervisor unexpectedly "placed his hand on Saxton's leg above the knee several times and once rubbed his hand along her upper thigh." *Id.* at 528. Although Saxton removed his hand and told him to stop, he later pulled her into a doorway and kissed her for a few seconds, prompting her to again push him away. *Id.* Three weeks later, during a work-related lunch, the supervisor "suddenly 'lurched' at her from behind some bushes," but she rebuffed the advance. *Id.* During the ensuring hostile work environment lawsuit, the district court granted AT&T's motion for summary judgment and the Seventh Circuit affirmed, holding that "[a]lthough [the supervisor's] conduct was undoubtedly inappropriate, it was not so severe or pervasive as to create an objectively hostile work environment." *Id.* at 534. Middleton's conduct here was, by any objective measure, even less severe than the supervisor's conduct in *Saxton*—there was no physical contact whatsoever, Chesier never told him his advances were unwelcome, and the harassment was confined to a single three-hour exchange. *Cf. Manzo v. Laborers Int'l Union of N. Am., Local 872*, 2008 WL 686262, *3 (D. Nev. 2008), *aff'd sub nom. Manzo v. Laborers Int'l Union Of N. Am.*, 348 F. App'x 267 (9th Cir. 2009) ("[Supervisor's] comment to Plaintiff about [coworker] 'coming in his pants' was highly offensive, but this single incident that lasted perhaps only minutes cannot be considered severe or pervasive enough to create a hostile working environment.").

D. <u>"Reasonable Care" Defense</u>

Because Chesier fails to satisfy the third element of the *prima facie* test, the Court need not determine whether On Q can sustain the "reasonable care" affirmative defense.

Accordingly, **IT IS ORDERED THAT**:

1. On Q's motion for summary judgment (Doc. 61) is **granted**;
2. Chesier's motion for partial summary judgment (Doc. 59) is **denied as moot**; and
3. The Clerk of Court shall enter judgment accordingly and terminate this case.

Dated this 18th day of April, 2019.

_____
Dominic W. Lanza
United States District Judge